692 A.2d 546

THE PEP BOYS, PLAINTIFF–APPELLANT, v. CIGNA INDEMNITY
INSURANCE COMPANY OF NORTH AMERICA, CIGNA PROP-
ERTY & CASUALTY COMPANIES, DEFENDANTS–RESPON-
DENTS.

Superior Court of New Jersey
Appellate Division

Argued February 11, 1997—Decided April 28, 1997.

Before D'ANNUNZIO, NEWMAN and VILLANUEVA, JJ.

*Lawrence B. Berg* argued the cause for appellant (*Marshall, Dennehy, Warner, Coleman & Goggin,* attorneys; *Mr. Berg* and *Walter J. Klekotka,* on the brief).

*Alfred Abbotts* argued the cause for respondent (*K. Ruth Larsen,* attorney; *Edward C. McHugh,* of counsel; *Mr. Abbotts,* on the brief).

The opinion of the court was delivered by

D'ANNUNZIO, J.A.D.

This is a dispute about liability insurance coverage. It arises out of the death of Richard Parks, Jr.

On May 25, 1990, the decedent, Richard Parks, Jr., his younger brother and another boy decided to purchase freon because the brother had heard that it could "get you high." At that time, decedent was seventeen years old, the brother was fifteen, and the third boy was fourteen.

The three boys proceeded to the Pep Boys store in Howell Township, New Jersey because the decedent's brother knew that it carried freon, which was used in automobile air conditioning systems. They pooled their money to buy as many cans of No. 12 freon as they could afford. The third boy purchased two cans of freon from the cashier, who did not question him about his age or the purpose of his purchase. The boy claimed that he did not see any signs restricting the sale of freon. Realizing that he had purchased the wrong kind of freon, he went back into the store to exchange the two cans. Patricia Stallworth, an assistant manager, directed him to where the freon was located and then completed the exchange for three other cans of freon. He explained to Stallworth that he needed freon without an oil additive. He again was not asked for any identification, although Stallworth had inferred that he was of age because he had been waited on before and looked older.

Despite a warning on the back of the can stating that inhalation could cause death, the Parks brothers, the boy who purchased the

freon, and two other boys took turns inhaling or "huffing" the freon. Decedent then fell over and could not be resuscitated. The cause of death was "acute freon toxicity."

On October 9, 1991, Richard A. Parks, General Administrator and Administrator Ad Prosequendum of the Estate of Richard Parks, Jr., filed a wrongful death and survival complaint against The Pep Boys and its employees stemming from the death of Richard Parks, Jr. The complaint alleged causes of action for negligence for the sale of freon to a minor in violation of *N.J.S.A.* 2A:170–25.9 to 25.13, negligence in training the store's personnel, and reckless indifference by the store and its employees to the harm the freon could cause. Plaintiff did not assert any claims under the Product Liability Act for a manufacturing defect, a design defect or a warning defect, *N.J.S.A.* 2A:58C–2, and did not sue the manufacturer. *See Parks v. Pep Boys,* 282 *N.J.Super.* 1, 659 *A.*2d 471 (App.Div.1995) (affirming in part and reversing in part, a summary judgment in favor of Pep Boys).

At the time of the sale, the manufacturer of the freon, Interdynamics, Inc., had a policy of liability insurance with Cigna Indemnity Insurance Company of North America and Cigna Property & Casualty Companies (Cigna). The policy included a vendor's endorsement covering "All Vendors of the Insured," which included Pep Boys, and "All Products of the Insured," which included the freon sold by Pep Boys to decedent's companion. David A. Wiley, Jr., Pep Boy's claims manager, submitted an affidavit to the trial court. The affidavit stated, in part:

2. In my capacity as claims manager, it has been my responsibility to insure that all vendors selling products to Pep Boys have insurance affording coverage to Pep Boys for injuries to third-parties arising out of the sale of the vendor's products.

3. In order for a vendor to sell products to Pep Boys, they are required to either include Pep Boys as an additional insured on the vendor's insurance policy or have a broad form vendor's endorsement included with the policy.

4. The above requirement was enacted due to a prevailing concern about the expense of defending cases which stem from selling the products of others.

5. As such, Pep Boys insists on a vendor's endorsement to protect against claims resulting from the sale of a vendor's product. Pep Boys has a reasonable

expectation that all risks associated with selling the products of others will be shifted to the particular vendor.

Cigna denied Pep Boys' request for coverage of the Parks tort claim on the ground that decedent's death was caused by Pep Boys' negligence and, therefore, did not come within the endorsement.

Pep Boys filed this action seeking a declaratory judgment of coverage. While the declaratory judgment action was pending, Pep Boys settled the tort claim for $100,000. Pep Boys then sought reimbursement from Cigna of the settlement amount and the expense of defending the tort claim. The court granted summary judgment to Cigna and Pep Boys appeals.

The endorsement provides:

WHO IS AN INSURED (Section II) is amended to include as an insured any person or organization (referred to below as vendor) shown in the Schedule, but only with respect to "bodily injury" or "property damage" *arising out of* "your products" shown in the Schedule which are distributed or sold in the regular course of the vendor's business, subject to the following additional exclusions:

1. The insurance afforded the vendor does not apply to:

   a. "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

   b. Any express warranty unauthorized by you;

   c. Any physical or chemical change in the product made intentionally by the vendor;

   d. Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

   e. Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

   f. Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

   g. Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor.

2. This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

As previously indicated, Cigna denied coverage on the ground that the injury was due to "Pep Boys' independent acts of negligence," implying, therefore, that the injury was not one "arising out of" the freon. The trial court, in a letter opinion, adopted this reasoning when it determined that "[t]he alleged problem was not the product but rather its sale to a minor." The court also relied on *American White Cross Labs., Inc. v. Continental Ins. Co.*, 202 *N.J.Super.* 372, 495 *A.2d* 152 (App.Div.1985), as well as "the narrow meaning that courts have assigned the phrase 'arising out of.'"

The principles of law guiding our construction of insurance policies are well settled. Judge Michels recently restated them in *Franklin Mut. Ins. Co. v. Security Indemn. Ins. Co.*, 275 *N.J.Super.* 335, 646 *A.2d* 443 (App.Div.), *certif. denied*, 139 *N.J.* 185, 652 *A.2d* 173 (1994):

> Our function in construing a policy of insurance, as with any other contract, is to search broadly for the probable common intent of the parties in an effort to find a reasonable meaning in keeping with the express general purpose thereof. *See Fidelity Union Trust Co. v. Robert*, 36 *N.J.* 561, 567, 178 *A.2d* 185 (1962); *Scarfi v. Aetna Cas. & Sur. Co.*, 233 *N.J.Super.* 509, 514, 559 *A.2d* 459 (App.Div.1989); *Tooker v. Hartford Acc. & Indem. Co.*, 128 *N.J.Super.* 217, 222–23, 319 *A.2d* 743 (App.Div.1974); *Ins. Co. of State of Penna. v. Palmieri*, 81 *N.J.Super.* 170, 179, 195 *A.2d* 205 (App.Div.1963), *certif. den*, 41 *N.J.* 389, 197 *A.2d* 15 (1964). In this pursuit, a broad and liberal view should be taken so that the policy is construed in favor of the insured. *Bello v. Hurley Limousines, Inc.*, 249 *N.J.Super.* 31, 40, 591 *A.2d* 1356 (App.Div.1991). Where the language of a policy will support two meanings, one favorable to the insured and the other favorable to the insurer, the interpretation sustaining coverage must be applied. *Mazzilli v. Acc. & Cas. Ins.*

---

1 The endorsement defines "an insured" under Interdynamics' policy to include, under certain circumstances, Interdynamics' vendors. The underlying policy issued by Cigna to Interdynamics is not part of the record, and, therefore, we do not know what coverage is provided to "an insured." In its letter opinion the trial court indicates that Cigna's policy covers all bodily injury arising out of Interdynamics' products. At oral argument, both parties resisted our invitation to supplement the record with a copy of the policy. The parties agreed that it was not necessary to our resolution of the appeal. We conclude, therefore, that Cigna must defend and indemnify Pep Boys if the Parks' tort claim was based on bodily injury "arising out of" the freon.

Co. of Winterthur, 35 N.J. 1, 7, 170 A.2d 800 (1961). Additionally, it is a well-settled principle that purchasers of insurance are entitled to "the broad measure of protection necessary to fulfill their reasonable expectations." Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 482, 170 A.2d 22 (1961). In the language of our Supreme Court, "their policies should be construed liberally in their favor to the end that coverage is afforded 'to the full extent that any fair interpretation will allow.'" Ibid.; see also Westchester Fire Ins. Co. v. Continental Ins. Cos., 126 N.J.Super. 29, 36, 312 A.2d 664 (App.Div.1973), aff'd o.b., 65 N.J. 152, 319 A.2d 732 (1974).

[Id. at 339–40, 646 A.2d 443.]

Franklin involved a liability policy issued to a tenant who operated a luncheonette located in an office building. The policy included an endorsement providing coverage to the landlord "with respect to liability arising out of the ownership, maintenance or use of that part of the premises ... leased to the named insured." The plaintiff in the underlying tort action fell after she emerged from the luncheonette. She fell because she slipped "on a substance on top of the exterior steps." Franklin, supra, 275 N.J.Super. at 337, 646 A.2d 443. There was evidence that the landlord was responsible for the maintenance and repair of the exterior steps.

We ruled that "[t]he key phrase 'arising out of the use' must be interpreted or construed in a broad and comprehensive sense to mean 'originating from the use of' or 'growing out of the use of' the premises leased to [tenant]. Thus, there need be shown only a substantial nexus between the occurrence and the use of the leased premises in order for coverage to attach." Id. at 340–41, 646 A.2d 443; accord Records v. Aetna Life & Cas. Ins., 294 N.J.Super. 463, 468, 683 A.2d 834 (App.Div.1996); see also McCabe v. Old Republic Ins. Co., 425 Pa. 221, 228 A.2d 901, 903 (1967) (holding that "'arising out of' means causally connected with, not proximately caused by.").

We concluded that there was a sufficient relationship between the injured party's fall on the exterior steps and the use of the luncheonette to trigger coverage for the landlord under the endorsement. We stated that "the accident arose out of the use of premises leased to [tenant] in the broadest and most comprehen-

sive sense, and was therefore within the coverage provided to [Landlord] by the [endorsement]." *Franklin, supra,* 275 *N.J.Super.* at 341, 646 *A.*2d 443.

*Sportmart, Inc. v. Daisy Mfg. Co.,* 268 *Ill.App.*3d 974, 206 *Ill.Dec.* 355, 645 *N.E.*2d 360 (1994) involved the vendor's endorsement at issue in the present case. The issue arose in the context of an injury to Anthony Miceli who was shooting a BB gun using pellets he had bought from Sportmart. A ricochetting pellet penetrated Anthony's left eye. Anthony and his father sued Sportmart, alleging that the store was negligent in selling pellets to a minor in contravention of a statute and store policy.

Daisy, the pellet manufacturer, and its insurer, Continental, rejected Sportmart's request for coverage under the vendor's endorsement. The grounds of their rejection were identical to Cigna's grounds in the present case: "the Miceli's complaint was premised upon Sportmart's negligence in selling the ammunition rather than upon any defect in Daisy's product." *Id.* 206 *Ill.Dec.* at 357, 645 *N.E.*2d at 362.

The Illinois appellate court reversed a summary judgment in favor of Daisy and Continental. The court first addressed the phrase "arising out." It stated:

> The phrase "arising out of" repeatedly has been recognized as being broad as well as vague. (*Maryland Casualty,* 126 *Ill.App.*3d at 154, 81 *Ill.Dec.* 289, 466 *N.E.*2d 1091; *Aetna Casualty & Surety Co. v. Prestige Casualty Co.* (1990), 195 *Ill.App.*3d 660, 665, 142 *Ill.Dec.* 689, 553 *N.E.*2d 39.) It must therefore be construed strictly against the insurer. (*Illinois Founders Insurance Co. v. Smith* (1992), 231 *Ill.App.*3d 269, 275, 172 *Ill.Dec.* 780, 596 *N.E.*2d 59). In worker's compensation claims and insurance litigation, this language is considered satisfied by a mere causal connection and does not necessarily require proximate causation. (*Consolidated Rail Corp. v. Liberty Mutual Insurance Co.* (1981), 92 *Ill.App.*3d 1066, 1068, 48 *Ill.Dec.* 485, 416 *N.E.*2d 758; *Maryland Casualty,* 126 *Ill.App.*3d at 154, 81 *Ill.Dec.* 289, 466 *N.E.*2d 1091.) Synonymous with "arising out of" are the terms "connected with," "incidental to," "originating from," "growing out of," and "flowing from." *Maryland Casualty Co.,* 126 *Ill.App.*3d at 154, 81 *Ill.Dec.* 289, 466 *N.E.*2d 1091; *Consolidated Rail Corp.,* 92 *Ill.App.*3d at 1069, 48 *Ill.Dec.* 485, 416 *N.E.*2d 758.

> [*Id.* 206 *Ill.Dec.* at 358, 645 *N.E.*2d at 363.]

The court also rejected defendants' contention that the vendor's endorsement is limited to coverage for claims alleging a product defect, and noted that "there is no policy exclusion for injuries directly caused by the product which are also attributable to the negligence of another party." *Ibid.*

Finally, the court concluded that "the broad language must be construed against the insurer to require coverage for all bodily injury 'growing out of' or resulting from Daisy's product." *Ibid.*

In the present case, Interdynamics' freon killed decedent. There may have been a basis for imposing liability on Pep Boys for its negligence, but the product was the death-causing substance. Moreover, as *Sportmart* noted, the endorsement, though it contains a page of detailed and specific exclusions, does not exclude coverage if the vendor's negligence is a proximate cause of injury. Nor does the endorsement limit its coverage to claims of manufacturing or design defects, or failure to warn.

Cigna places heavy reliance on our opinion in *American White Cross, supra,* 202 *N.J.Super.* 372, 495 *A.2d* 152, where this court analyzed the purpose of the vendor's endorsement "viewing realistically its nature and its place not only in the commercial marketplace but within the world of insurance from which it springs." *American* involved the bulk sale of cotton by the manufacturer to American. American sterilized the cotton, cut it into smaller units and packaged each unit separately in a box. American developed the box's design and labeling and marketed the product for sale in supermarkets.

The injured party, Denise Baran, purchased some of American's packages in a supermarket and used some of the cotton in a costume. The cotton was ignited by a match or cigarette and Baran was burned. Baran sued the manufacturer and American, among others.

Continental Insurance Company insured the manufacturer and had issued a vendor's endorsement. American demanded a defense against the Baran claim and eventual indemnification from

Continental in the event of a judgment for Baran. Continental disclaimed coverage, relying on certain exclusions in the endorsement. The first exclusion was triggered if the vendor effected a "change in the condition of the product." The second exclusion precluded coverage if the vendor "labeled or relabeled" the product.

Before addressing the specific dispute before it, the court discussed its view of the role of the vendor's endorsement. The court stated:

> When a manufacturer produces a product which contains a defect in design or one caused by faulty workmanship and it is sold to a distributor who in turn sells it to a retailer, the latter two links in the chain to the ultimate consumer ordinarily are merely conduits in the stream of commerce which ends at the ultimate consumer. The manufacturing or design defect, as to which they had no creative role, was in existence when each of them received the product and each is merely a nonculpable accessory in the eventual sale. Nevertheless, each, in that role, is strictly liable to the injured ultimate user.... The nonculpable distributor or retailer is not, however, without remedy and has "an action over against the manufacturer who should bear the primary responsibility for putting the defective products in the stream of trade." (Citation omitted.) It is in this complex of the facts of merchandising life and the imposition of strict liability at law that the vendor's endorsement has its natural role and serves specific purpose. Since, in the ordinary case, the liability trail eventually leads back to the manufacturer, and consequently to his insurer, it is a matter of common sense and fair dealing that the coverage of the manufacturer should be extended to the distributor and the insurance of the distributor in turn cover the retailer.

> [*Id.* at 378–79, 495 *A.*2d 152 (citations omitted).]

The opinion suggested that "[t]he vendor receives a more limited form of coverage which does not protect it against its own acts proximately related to the consumer's injury." *Id.* at 380, 495 *A.*2d 152.

The court then discussed in general terms the exclusions contained in the endorsement. The court stated:

> These exclusions are not vague, each is directed to denial of coverage where some act of the vendor affects the product and thereby causes personal injury. This insurance is clearly designed to cover the vendor when he is only a conduit of the product in the stream of commerce but not when he is the instrumentality causing bodily injury to another.

> [*Id.* at 380–81, 495 *A.*2d 152.]

The court concluded that American was not entitled to coverage because the labeling-relabeling exclusion applied. The court expressed its conclusion in the following language:

> We perceive no ambiguity in this exclusion. It declares that there is no coverage for claims for "bodily injury" which arise "out of" products which after sale by the named insured "have been labeled or relabeled ... by ... the vendor." The Barans' claims for bodily injuries were premised on a failure to warn defect in American's eventual product. That product was one reduced from the bulk raw material sold by [the manufacturer]. It was rewrapped, repackaged and independently covered by a label of American's choosing, which lacked the allegedly necessary warning as to the inherent, and commonly known, flammable property of cotton. It clearly is excluded from Continental's coverage.
>
> [*Id.* at 381, 495 *A*.2d 152.]

*Cf. Mattocks v. Daylin,* 452 *F.Supp.* 512, 515 (W.D.Pa.1978) (reasoning that vendor's act, constituting an exclusion under vendor's endorsement, did not void coverage because it did not cause plaintiff's injuries), *aff'd,* 614 *F.*2d 770 (3rd Cir.1979).

We have devoted a lot of attention to *American* because it is the cornerstone of Cigna's defense in this case and, we suspect, it is a talisman invoked by carriers to limit coverage under vendor's endorsements. Our role in the present case is to apply the language of the vendor's endorsement before us to the specific facts in this case.

It is apparent that *American* is distinguishable from the present case. The operative language in *American*'s endorsement differs substantially and significantly from Cigna's endorsement in the present case. The *American* endorsement defined persons insured to include a vendor "but only with respect to the distribution or sale in the regular course of the vendor's business of the named insured's products...." The exclusions followed. The Cigna endorsement, however, covered vendors "with respect to bodily injury ... arising out of" Interdynamics' products. In the present case, the issue is whether Parks' injury and death arose out of Interdynamics' product. This is a very different issue from the issue addressed in *American.*

In *American,* the issue was whether certain exclusions in Continental's endorsement applied to preclude coverage. In the pres-

ent case, no contention is made regarding applicability of the exclusions. The exclusions in Continental's policy as well as the exclusions in Cigna's policy are specific to claims based on product defects. The exclusions in Continental's policy, therefore, were relevant and controlling because the underlying tort action in *American* was based on a claim of failure to warn, that is, a product defect. Consequently, *American*'s discussion of the role of each element in the chain of distribution had some relevance.

Finally, the extensive analysis in the *American* opinion of the role of the endorsement was dictum. The only issue was whether the exclusions applied. The court in *American* found that the exclusions were not ambiguous and were clearly applicable. Consequently, *American*'s broad statements regarding the endorsement's boundaries, though related to the underlying claim of a product defect, were unnecessary to *American*'s holding.

In the context of the present case, we are persuaded that the phrase "bodily injury arising out of" the freon is not ambiguous because, as previously indicated, the freon, though misused by young Parks, killed him. *Cf. McCabe, supra,* 228 *A.*2d at 903 (phrase "arising out of" used in insurance policy may or may not be ambiguous, depending on context of the case). To the extent, however that the phrase is ambiguous, the ambiguity must be resolved in favor of the insured, that is, in favor of coverage. *See Voorhees v. Preferred Mut. Ins. Co.,* 128 *N.J.* 165, 175, 607 *A.*2d 1255 (1992). If the scriveners of these endorsements intended to limit coverage to claims involving product defects or to exclude coverage where the vendor has some independent culpability, then the endorsement should have expressed that intent.

We conclude that Pep Boys was entitled to coverage for Parks' claim, both for indemnification and defense. The judgment is reversed and the matter is remanded for a determination regarding the reasonableness of the settlement amount and the claimed defense costs. We do not retain jurisdiction.