In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1946

Hartford Fire Insurance Company,

Plaintiff-Appellant,

v.

St. Paul Surplus Lines Insurance Company,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 98 C 584--Allen Sharp, Judge.

Argued September 10, 2001--Decided February 6, 2002


  Before Posner, Kanne, and Evans, Circuit
Judges.

  Posner, Circuit Judge.  This diversity
suit, governed all agree by California
law, involves a dispute between two
insurance companies over the scope and
applicability of the form of insurance
known as a "vendor's endorsement." A
manufacturer will often add to its
products liability insurance an
endorsement extending coverage to
distributors of its product who may be
sued for breach of warranty or for strict
products liability should the product
turn out to be defective or unreasonably
dangerous and cause an injury. "When a
manufacturer produces a product which
contains a defect in design or one caused
by faulty workmanship and it is sold to a
distributor who in turn sells it to a
retailer, the latter two links in the
chain to the ultimate consumer ordinarily
are merely conduits in the stream of
commerce which ends at the ultimate
consumer. The manufacturing or design
defect, as to which they had no creative
role, was in existence when each of them
received the product and each is merely a
nonculpable accessory in the eventual
sale. Nevertheless, each, in that role,
is strictly liable to the injured
ultimate user. . . . The nonculpable
distributor or retailer is not, however,
without remedy and has 'an action over

against the manufacturer who should bear the primary responsibility for putting the defective products in the stream of trade.' . . . Since, in the ordinary case, the liability trail eventually leads back to the manufacturer, and consequently to his insurer, it is a matter of common sense and fair dealing that the coverage of the manufacturer should be extended to the distributor and the insurance of the distributor in turn cover the retailer." American White Cross Laboratories, Inc. v. Continental Ins. Co., 495 A.2d 152, 155-56 (N.J. App. 1985) (citations omitted); see also Hartford Accident & Indemnity Co. v. Bennett, 651 So. 2d 806, 808 (Fla. App. 1995); Dominick's Finer Foods, Inc. v. American Manufacturers Mutual Ins. Co., 516 N.E.2d 544, 546 (Ill. App. 1987); Peter J. Kalis, Thomas M. Reiter, & James R. Segerdahl, Policyholder's Guide to the Law of Insurance Coverage sec. 19.06[B][4][a], pp. 19-37 to 19-38 (1997). We don't think "fair dealing" has much to do with anything, but one can perceive the economic logic of this form of insurance easily enough; it allows the insurer to coordinate the defense of multiple suits arising out of the same injury and spares the distributor the expense of hiring a lawyer to defend against a suit arising out of a design or manufacturing defect with which the distributor had nothing to do.

Wendy Como suffered a stroke on August 31, 1995. Claiming that it had been caused by a diet pill she had been taking, "Trim Easy," manufactured by Nion Laboratories and distributed by Team Up International, she sued both companies. Team Up was not just a distributor, however; it had supplied Nion with the formula for Trim Easy and it had also designed the contents of the label, including the warnings, and provided printed labels to Nion, which placed them on the bottles of the pill. Como's suit included a charge that the labels had failed to warn adequately of the risks created by the product. The suit was settled for a sum exceeding $1 million (the exact amount is unclear from the record), paid by the Hartford insurance company, the insurer of Team Up.

Hartford's policy was excess, meaning that Hartford would be responsible only for those losses that exceeded the caps

on Team Up's other insurance policies. St. Paul, the defendant, had written a primary policy of liability insurance for Weider Nutrition Group, which had acquired Nion. That policy contained a vendor's endorsement, and Hartford brought this suit to obtain a declaration that Team Up was covered by the endorsement and so St. Paul, as Team Up's primary insurer by virtue of the endorsement, should bear the expense of the settlement of Como's suit up to St. Paul's policy limit of $1 million.

All this is quite a tangle, so let us recapitulate. St. Paul insured Weider, which acquired the manufacturer of the pills, Nion. Hartford insured Team Up, Nion's distributor. Both policies were in force when Como was injured. If by virtue of the vendor's endorsement in St. Paul's policy, that policy also covered Team Up, so that Team Up was insured by both Hartford and St. Paul, then Hartford, as the excess insurer, is entitled to lay off a chunk of the settlement that it paid Como on St. Paul, the primary insurer. The district court, however, held that the vendor's endorsement did not cover Team Up, and granted summary judgment for St. Paul.

As we noted at the outset, the purpose of a vendor's endorsement is to protect the vendor (i.e., dealer or other distributor) against the expense of being dragged as an additional defendant into a lawsuit arising from a defect in a product that it distributes. It makes sense for the manufacturer to buy the insurance, as he has a better sense of the risk that there will be suits complaining about defects in his products. This assumes, however, that the vendor's role in the distribution of the product is passive. The manufacturer would be unlikely to insure the vendor against defects introduced by the vendor himself, SDR Co. v. Federal Ins. Co., 242 Cal. Rptr. 534, 538 (Cal. App. 1987); American White Cross Laboratories, Inc. v. Continental Ins. Co., supra, 495 A.2d at 156-57, the risk of those defects being better known to the vendor than to the manufacturer. The vendor's endorsement even contains an express exception for cases in which a claim of products liability is based on the labeling or relabeling of the product by the vendor, for example because he has

omitted a warning without which the product poses an unreasonable danger to the consumer. Id. at 157; Lee R. Russ & Thomas F. Segalla, 9 Couch on Insurance sec. 130:10 (3d ed. Supp. 2000).

Beyond that, the vendor's endorsement is inapplicable if the vendor, whether by participating in the creation of the product or by altering or repairing it, may be responsible for the alleged defect out of which the products liability suit arises. That at least is the majority view, see, e.g., Mitchell v. Stop & Shop Companies, Inc., 672 N.E.2d 544, 545-46 (Mass. App. 1996); Senco of Florida, Inc. v. Continental Casualty Co., 440 So. 2d 625, 626 (Fla. App. 1983), but, more important, it is the view of California, SDR Co. v. Federal Ins. Co., supra, 242 Cal. Rptr. at 538, and it is California law that governs the substantive issues in this diversity suit. Some cases, such as Pep Boys v. Cigna Indemnity Ins. Co., 692 A.2d 546, 547-48, 550, 552 (N.J. App. 1997), and Sportmart, Inc. v. Daisy Manufacturing Co., 645 N.E.2d 360, 362-64 (Ill. App. 1994), hold that the vendor's endorsement is applicable if the vendor, rather than introducing a defect or relabeling in a way that conceals a danger, is merely negligent as to whom he sells to (for example, selling to children a product intended for adults and dangerous to children), but this is a distinction without a difference.

The majority view is not based on the language of the vendor's endorsement, which does not define "vendor," or on the ordinary meaning of the word, which does not distinguish between active and passive vendors, but on the improbability of supposing that the manufacturer's insurer intends to protect others against the risks that the others create. A further consideration is that vendor's endorsement policies are cheap add-ons to products liability policies, American White Cross Laboratories, Inc. v. Continental Ins. Co., supra, 495 A.2d at 156, and their cheapness makes the most sense if they're limited to the case in which the vendor, being completely passive in relation to the harm giving rise to liability rather than the active author of the harm, would be entitled to indemnity from the manufacturer in the event that he (the vendor) was sued and held liable and made to pay damages. For in such a case the vendor's endorsement

would be unlikely to impose a big loss on the insurance company even if the vendor was hit with a damages judgment.

Interpreting contracts to make economic sense is a method of contract interpretation that we have commended in other cases. PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 615 (7th Cir. 1998); Rhone-Poulenc Inc. v. International Ins. Co., 71 F.3d 1299, 1303 (7th Cir. 1995) (an insurance case); In re Kazmierczak, 24 F.3d 1020, 1022 (7th Cir. 1994); In re Stoecker, 5 F.3d 1022, 1029-30 (7th Cir. 1993). It rests on the commonsensical observation that people usually don't pay a price for a good or service that is wildly in excess of its market value, or sell a good or service (here insurance) for a price hugely less than its market value, which would be the case if the cheap vendor's endorsement bought the kind of coverage that Hartford contends it buys. That is just a presumption, but it has not been rebutted. Both because Team Up, Hartford's insured, was not a passive vendor, and because the underlying products liability suit arises in part from label content furnished by Team Up to the manufacturer, Nion, and thus comes within the express exemption, Team Up does not have coverage under the vendor's endorsement in Weider's policy.

There is an alternative route to this conclusion. The pill or pills that Wendy Como took that caused her stroke were sold by Nion before its assets became assets of Weider, and the vendor's endorsement on which Hartford relies is contained in an insurance policy that St. Paul sold Weider, not Nion. Como had been taking Trim Easy right up to the time of the stroke in August 1995, but she had obtained the pills at retail rather than from the manufacturer. We do not know exactly when the pills left Nion's premises. But we know that Weider acquired Nion's assets pursuant to an asset acquisition agreement that became effective on June 1, 1995; and Hartford conceded during discovery that the particular assets that injured Como, namely the Trim Easy pills that she took, had by that date been sold by Nion to Team Up (for remember that Team Up was the vendor of Trim Easy) and so were no longer assets of Nion and did not pass in the sale.

It is conceivable that Weider agreed to insure vendors of Nion's product rather than just vendors of its own products. At least the possibility is not excluded by the language of the policy, which provides coverage for vendors of products manufactured either by Weider or by "others whose business or assets you've acquired." But it is implausible that this language was intended to extend coverage to products that might have been manufactured many years before Weider acquired the manufacturer. St. Paul would have been unlikely to buy such a pig in a poke. Oliver Machinery Co. v. United States Fidelity & Guaranty Co., 232 Cal. Rptr. 691, 694-96 (Cal. App. 1986). More likely the language is intended merely to cover Weider for postacquisition sales of acquired assets.

Against this conclusion Hartford points to the method of calculating the premium for the vendor's endorsement in Weider's policy. The premium is based in the first instance on an estimate of the vendor's sales of the manufacturer's product during the period in which the policy is in force, which was October 1, 1994, to December 1, 1995; but at the end of that period the premium is adjusted for the actual sales during the period. This means that sales made by Team Up (assuming, contrary to our first holding, that Team Up was covered by the vendor's endorsement) as early as October 1, 1994 (and we'll assume for the sake of argument that the pills taken by Wendy Como were sold by Nion after that date, as they may have been, for we know only that they were sold before June 1, 1995), could be used to adjust the premium due to St. Paul. So Weider may actually have paid St. Paul a premium based in part on the sale by Nion of the very pills that caused Como's stroke.

We don't think Hartford is reading the premium-adjustment provision aright, however. The vendor's endorsement in St. Paul's policy is for the benefit of Weider's vendors, and Team Up did not become a Weider vendor until Weider acquired Nion's assets, which was after Nion sold the pills that Como took. The purpose of the premium adjustment is to recompute the premium for actual coverage on the basis of experience during the period of coverage; it is not to expand

coverage. Cooper Companies v.
Transcontinental Ins. Co., 37 Cal. Rptr.
2d 508, 516 (Cal. App. 1995).

Affirmed.