[833 NE2d 232, 800 NYS2d 89]

RAYMOND CORPORATION et al., Respondents, v NATIONAL UNION
FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Appellant.

Argued May 3, 2005; decided June 29, 2005

## POINTS OF COUNSEL

*Fiedelman & McGaw,* Jericho (*Andrew Zajac* of counsel), *Cozen O'Connor,* Philadelphia, Pennsylvania, and *Mitchell, Goris & Knych,* Cazenovia, for appellant. I. Any arguments raised by Raymond Corporation and Arbor Handling Services, Inc. in support of the Appellate Division's decision would be unpreserved for this Court's review. (*Incorporated Vil. of Cedarhurst v Hanover Ins. Co.,* 89 NY2d 293; *Utica Mut. Ins. Co. v Prudential Prop. & Cas. Ins. Co.,* 64 NY2d 1049; *Arc Eng'g v State of New York,* 293 NY 819; *Lindlots Realty Corp. v County of Suffolk,* 278 NY 45.) II. The Supreme Court properly held that the insuring clause in the vendor's endorsement does not extend to Arbor Handling Services, Inc.'s independent negligence. (*Graphic Arts Mut. Ins. Co. v Bakers Mut. Ins. Co. of N.Y.,* 45 NY2d 551; *Frontier Insulation Contrs. v Merchants Mut. Ins. Co.,* 91 NY2d 169; *Basil Dev. Corp. v General Acc. Ins. Co.,* 89 NY2d 1057; *Harris v Allstate Ins. Co.,* 309 NY 72; *Jefferson Ins. Co. of N.Y. v Travelers Indem. Co.,* 92 NY2d 363; *Baughman v Merchants Mut. Ins. Co.,* 87 NY2d 589; *Champion Intl. Corp. v Continental Cas. Co.,* 546 F2d 502; *Hartford Fire Ins. Co. v St. Paul Surplus Lines Ins. Co.,* 280 F3d 744; *Mount Vernon Fire Ins. Co. v Creative Hous.,* 88 NY2d 347; *RJC Realty Holding Corp. v Republic Franklin Ins. Co.,* 2 NY3d 158.) III. The Supreme Court's well-founded findings of fact should be reinstated. (*Matter of Frontier Ins. Co. v Town Bd. of Town of Thompson,* 285 AD2d 953; *G.B. Kent & Sons v Helena Rubinstein, Inc.,* 47 NY2d 561; *Andon v 302-304 Mott St. Assoc.,* 94 NY2d 740; *Friedman v State of New York,* 67 NY2d 271; *Loughry v Lincoln First Bank,* 67 NY2d 369; *Kuehne & Nagel v Baiden,* 36 NY2d 539; *Harrington v Harrington,* 290 NY 126.) IV. The Supreme Court correctly determined that the exclusion for "any failure to make such . . . adjustments . . . or servicing as the Vendor has agreed to make" bars Arbor Handling Services, Inc.'s claim for coverage. (*Bretton v Mutual of Omaha Ins. Co.,* 110 AD2d 46, 66 NY2d 1020; *Consolidated Edison Co. of N.Y. v Allstate Ins. Co.,* 98 NY2d 208.)

*Powers Santola, LLP,* Albany (*Michael J. Hutter* of counsel), and *Nixon Peabody LLP,* Rochester (*William S. Brandt* of counsel), for respondents. I. The scope of insurance coverage

under a vendor's endorsement is determined by the wording of the vendor's endorsement in issue. (*Stasack v Capital Dist. Physicians' Health Plan,* 290 AD2d 866; *State of New York v Home Indem. Co.,* 66 NY2d 669; *Sanabria v American Home Assur. Co.,* 68 NY2d 866; *Demopoulous v New York Cent. Mut. Fire Ins. Co.,* 280 AD2d 855; *Flynn v Timms,* 199 AD2d 873; *Breed v Insurance Co. of N. Am.,* 46 NY2d 351; *Caporino v Travelers Ins. Co.,* 62 NY2d 234; *Butler v New York Cent. Mut. Fire Ins. Co.,* 274 AD2d 924; *Moshiko, Inc. v Seiger & Smith,* 137 AD2d 170, 72 NY2d 945; *Speller v Sears, Roebuck & Co.,* 100 NY2d 38.) II. On the basis of its wording, Endorsement 5 is intended to provide coverage to vendors which have repaired, serviced or installed a Raymond Corporation product. (*Jefferson Ins. Co. of N.Y. v Travelers Indem. Co.,* 92 NY2d 363; *County of Columbia v Continental Ins. Co.,* 83 NY2d 618; *Ruttenberg v Davidge Data Sys. Corp.,* 215 AD2d 191.) III. Based on the undisputed facts, Arbor Handling Services, Inc. was a vendor entitled to coverage under Endorsement 5. (*Mount Vernon Fire Ins. Co. v Creative Hous.,* 88 NY2d 347; *New Hampshire Ins. Co. v Jefferson Ins. Co. of N.Y.,* 213 AD2d 325; *Aetna Cas. & Sur. Co. v Ocean Acc. & Guar. Corp., Ltd.,* 386 F2d 413; *Kmart Corp. v Fireman's Fund Ins. Co.,* 88 F Supp 2d 767.) IV. National Union Fire Insurance Company of Pittsburgh, Pa.'s "one label fits all" approach to vendor's endorsements defies the wording and intent of Endorsement 5 as well as the case law. (*Frontier Insulation Contrs. v Merchants Mut. Ins. Co.,* 91 NY2d 169; *Basil Dev. Corp. v General Acc. Ins. Co.,* 89 NY2d 1057; *Graphic Arts Mut. Ins. Co. v Bakers Mut. Ins. Co. of N.Y.,* 45 NY2d 551; *RJC Realty Holding Corp. v Republic Franklin Ins. Co.,* 2 NY3d 158; *Continental Cas. Co. v Rapid-American Corp.,* 80 NY2d 640; *Hartford Fire Ins. Co. v St. Paul Surplus Lines Ins. Co.,* 280 F3d 744.) V. The intent of Endorsement 5 cannot be altered by resorting to the terms of Raymond Corporation's independent self-insured indemnification program. (*Matter of Wallace v 600 Partners Co.,* 86 NY2d 543; *Matter of Primex Intl. Corp. v Wal-Mart Stores,* 89 NY2d 594.) VI. National Union Fire Insurance Company of Pittsburgh, Pa. failed to meet its burden to enforce exclusion 1 (D). (*Continental Cas. Co. v Rapid-American Corp.,* 80 NY2d 640.) VII. National Union Fire Insurance Company of Pittsburgh, Pa. improperly raises a claimed failure to preserve argument for the first time before this Court, and, in any event, the argument is meritless. (*Olan v Farrell Lines,* 64 NY2d 1092.)

**OPINION OF THE COURT**

READ, J.

Plaintiff Raymond Corporation manufactures sideloader fork-lifts.[1] Defendant National Union Fire Insurance Company of Pittsburgh, Pa. is Raymond's primary liability insurer. At the time of the accident prompting this lawsuit, plaintiff TBS Group, Inc., formerly Arbor Handling Services, Inc., was one of Raymond's vendors. The issue on this appeal is whether the vendor's endorsement in the commercial general liability policy that National issued to Raymond covers personal injury claims caused by the vendor's independent acts of negligence. For the reasons that follow, we conclude that the vendor's endorsement only covers those claims stemming from a defective product.

**I.**

In 1994, Arbor sold Joseph T. Ryerson & Son, a steel distributor, two new Raymond sideloaders for installation in its Philadelphia facility. Because its new cantilever rack system[2] was put into place months before the sideloaders' anticipated delivery date, Ryerson asked Arbor to secure two rental units for its use in the meantime. Arbor had one rental sideloader in-house in its own fleet, and agreed to "support . . . as if it were its own" any second sideloader that Ryerson might locate either "internally or externally."[3]

Ryerson subsequently located a second Raymond sideloader in Chicago. Ryerson rented this unit, which was disassembled and shipped to its facility in Philadelphia. Arbor sent two service technicians to reassemble and adjust the sideloader, which was configured for use in a rail-guided system where the guide rails were both closer together and higher than at Ryerson's facility.

---

**1.** Sideloader forklifts have forks on the side, and they run on rail systems in the aisles of warehouses.

**2.** Cantilever racks have arms cantilevered off a vertical column, and loads are placed either directly on the arms or on shelves supported by them. Their long, unobstructed shelves with no uprights are well suited for storage of long and varied loads.

**3.** When asked what he meant by this representation, Arbor's sales manager explained that Arbor typically would not service a competitor's unit installed in a customer's facility; however, "because of the unusual circumstances, with [Arbor] not being able to acquire a unit, if [Ryerson] . . . acquire[d] the unit, [Arbor] would fix the unit, should it break down, and . . . provide parts. And[ ] not tell [Ryerson] to fly someone in from Chicago to fix the unit that they rented from someone else."

In a rail-guided system, guide rollers are attached to the four corners of a sideloader and engage the rails, which are secured to the floor of the aisles between the racks. With proper adjustment, the guide rollers run against the parallel-facing rails with minimal clearance. A rail-guided system reduces the need for steering and thus the risk of injury to the operator, who does not have to place his head outside the vehicle to look at the wheels.

Arbor's technicians did not properly fit the sideloader's guide rollers within the rails at Ryerson's facility. As a result, the sideloader tended to wobble from side to side and to jam. A Ryerson employee sustained serious head and brain injuries while operating it. The parties do not dispute that Arbor's negligence—not any defect in Raymond's product, the sideloader—caused this accident.

The injured worker sued Raymond and Arbor, among others, for damages. During discovery, one of the two Arbor technicians essentially admitted that he knew the sideloader was unsafe when he placed it into service. Arbor and Raymond settled the action prior to trial for $6 million, and Arbor's primary liability insurer contributed $3 million toward the settlement. Raymond looked to National for the balance, contending that the vendor's endorsement, which listed Arbor as an additional insured, provided coverage. National contested coverage. Ultimately, however, National and Raymond agreed to contribute $2.5 million and $500,000 respectively, while reserving their rights to resolve their coverage dispute in a separate action.

Raymond and Arbor brought this action seeking judgment against National for Raymond's $500,000 contribution towards the settlement of the underlying action. National counterclaimed for judgment against Raymond in the amount of its $2.5 million contribution. After discovery, both parties moved for summary judgment. Supreme Court denied Raymond's motion and granted National summary judgment, dismissing Raymond's complaint and issuing judgment on National's counterclaim. The court concluded that the vendor's endorsement was limited to personal injury claims arising out of a product defect.

The Appellate Division, unlike Supreme Court, read the vendor's endorsement as broad enough to cover claims arising out of the vendor's negligence. Accordingly, the Appellate Division reversed, on the law, denied National's motion, and granted Raymond summary judgment, declaring that Arbor is an ad-

ditional insured under the policy. National appealed, and we now reverse.

## II.

The vendor's endorsement (Endorsement 5 ["Additional Insured—Vendors Schedule"]) in the policy states that,

> " '[s]ection III—Who is An Insured' is amended to include as an Insured any person or organization (referred to below as 'vendor') shown in the schedule, but only with respect to 'Bodily Injury' or 'Property Damage' arising out of 'Your Products' [Raymond's products] shown in the schedule which are distributed, sold, repaired, serviced, demonstrated, installed or rented to others in the regular course of the vendor[']s business, subject to" several exclusions.

"In determining a dispute over insurance coverage, we first look to the language of the policy. We construe the policy in a way that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect" (*Consolidated Edison Co. of N.Y. v Allstate Ins. Co.*, 98 NY2d 208, 221-222 [2002] [internal quotation marks and citations omitted]). We will "not disregard clear provisions which the insurers inserted in the policies and the insured accepted, and equitable considerations will not allow an extension of coverage beyond its fair intent and meaning in order to obviate objections which might have been foreseen and guarded against" (*Caporino v Travelers Ins. Co.*, 62 NY2d 234, 239 [1984] [citation omitted]).

Here, the policy covers vendors, such as Arbor,

> "only with respect to 'Bodily Injury' or 'Property Damage' *arising out of [Raymond's products] . . . which are distributed, sold, repaired, serviced, demonstrated, installed or rented* to others in the regular course of the vendor[']s business" (emphasis added).

We conclude that bodily injuries "arising out of [Raymond's products]" means injuries arising out of defects in the products, rather than arising out of the vendor's negligence. The modifying phrase, "which are distributed, sold, repaired, serviced, demonstrated, installed or rented to others in the regular course of the vendor[']s business," on which Raymond places so much

emphasis, is most naturally read to describe Arbor's activities with respect to Raymond's products, not—as Raymond argues—to indemnify Arbor for its negligent performance of those activities.

This phrase reflects that Arbor is not only a vendor of Raymond's products, but also repairs, services, demonstrates, installs and rents them. A vendor's endorsement "extend[s] coverage to distributors of [the vendor's] product who may be sued for breach of warranty or for strict products liability should the product turn out to be defective or unreasonably dangerous and cause an injury" (*Hartford Fire Ins. Co. v St. Paul Surplus Lines Ins. Co.*, 280 F3d 744, 745 [7th Cir 2002]). The vendor's endorsement here also extends coverage for any defective-product suits arising out of all the activities in addition to sale and distribution which Arbor, in fact, performs with respect to Raymond's products.

The dissent would discover coverage for vendor negligence in negative inferences from the policy's exclusions, but "an exclusion from insurance coverage cannot create coverage" (*Continental Cas. Co. v Pittsburgh Corning Corp.*, 917 F2d 297, 300 [7th Cir 1990]; *see also Weedo v Stone-E-Brick, Inc.*, 81 NJ 233, 247, 405 A2d 788, 795 [1979] [it is a "basic principle that exclusion clauses *subtract* from coverage rather than grant it"]). In any event, the exclusions that trouble the dissenters are consistent with our reading of the endorsement.

Exclusion 1 (A) excludes coverage for claims "for which the Insured is obligated to pay 'damages' by reason of the assumption of liability in a contract or agreement." For example, in order to obtain business or other favorable contract terms from a customer, Arbor might agree to assume liability in any product-defect suit brought against the customer by Arbor's employee who installed or repaired Raymond's product, or by the customer's employee. By excluding coverage for "[a]ny Express Warranty unauthorized by [Raymond]," exclusion 1 (B) simply provides that the policy's coverage for product defects is unavailable where the plaintiff's claim is based on an express warranty made by Arbor—for example, in a marketing or sales brochure—when this warranty was unauthorized by Raymond.

Exclusion 1 (D) excludes coverage for Arbor's failure to make promised or normally-performed "inspections, adjustments, tests or servicing . . . in connection with distribution or sale of the products." Thus, this exclusion provides that, while

defective-product injuries generally fall within the scope of the endorsement, there is no such coverage if Arbor fails to maintain the product. Contrary to the view expressed by the dissent, this exclusion makes sense because neglect to maintain a product properly may eventually cause it to become defective, or so it might be alleged in a product-defect lawsuit.

Under exclusion 1 (E), the coverage afforded Arbor does not apply to "[d]emonstration, installation, servicing or repair operations *except such operations performed by the Vendor*" (emphasis added). Thus, there is no coverage where the defective product causing the injury was being demonstrated, installed, serviced, repaired or rented by someone other than Arbor, Raymond's vendor. This exclusion ensures that Raymond—rather than a nonvendor third party—created the allegedly injury-causing product defect. Exclusions 1 (D) and 1 (E) both supply incentives for Arbor to maintain and demonstrate Raymond's products itself rather than farm out these activities to third parties who may lack Arbor's expertise or knowledge.

The vendor's endorsement has its genesis in products liability law. Accordingly, "[s]uch an endorsement covers the vendors' liability arising out of their role in passing the manufacturer's product on to customers, but does not cover vendors for their own negligence. Coverage under the vendor's endorsement is limited to injuries arising out of a defect in the manufacturer's product" (9 Couch on Insurance 3d § 130:3 [1997]).

As the Seventh Circuit Court of Appeals elaborated in *Hartford*,

> "the purpose of a vendor's endorsement is to protect the vendor (i.e., dealer or other distributor) *against the expense of being dragged as an additional defendant into a lawsuit arising from a defect in a product that it distributes*. It makes sense for the manufacturer to buy the insurance, as he has a better sense of the risk that there will be suits complaining about defects in his products. This assumes, however, that the vendor's role in the distribution of the product is passive. The manufacturer would be unlikely to insure the vendor against defects introduced by the vendor himself, . . . the risk of those defects being better known to the vendor than to the manufacturer. . . .
>
> "Beyond that, the vendor's endorsement is inappli-

cable if the vendor, whether by participating in the creation of the product or by altering or repairing it, may be responsible for the alleged defect out of which the products liability suit arises. That at least is the majority view" (280 F3d at 746-747 [citations omitted and emphasis added]).

The court further remarked upon the "improbability of supposing that the manufacturer's insurer intends to protect others against the risks that the others create" (*id.* at 747), and noted the

"further consideration . . . that vendor's endorsement policies are cheap add-ons to products liability policies . . . and their cheapness makes the most sense if they're limited to the case in which the vendor, being completely passive in relation to the harm giving rise to liability rather than the active author of the harm, would be entitled to indemnity from the manufacturer in the event that he (the vendor) was sued and held liable and made to pay damages. For in such a case the vendor's endorsement would be unlikely to impose a big loss on the insurance company even if the vendor was hit with a damages judgment" (*id.* [citation omitted]).

In sum, the vendor's endorsement in this case covers Arbor for defective-product suits arising out of its distribution, sale, repair, servicing, demonstration or rental of Raymond's products. Nothing in the wording of the endorsement (or the exclusions, for that matter) suggests that bodily injuries "arising out of" Raymond's products encompasses the vendor's independent acts of negligence. Our interpretation of the endorsement follows its language and comports with the traditional majority view, the origins of the vendor's endorsement as an outgrowth of products liability law, and common and economic sense.

Accordingly, the order of the Appellate Division should be reversed, with costs, and the order of Supreme Court reinstated.

R.S. Smith, J. (dissenting). I agree that the "purpose of a vendor's endorsement," as it is described in *Hartford Fire Ins. Co. v St. Paul Surplus Lines Ins. Co.* (280 F3d 744, 746 [7th Cir 2002]) and elsewhere, would be served by reading the endorsement in this case the way the majority does. But I cannot reconcile that reading with the language of the endorsement, and I therefore dissent.

The endorsement protects vendors like Arbor against claims for " 'Bodily Injury' or 'Property Damage' arising out of 'Your [Raymond's] Products' . . . which are distributed, sold, repaired, serviced, demonstrated, installed or rented to others in the regular course of the vendors [*sic*] business." The majority reads the words "arising out of 'Your Products' " to mean "arising out of defects in 'Your Products' " (majority op at 162). This reading of the phrase is not an impossible one, though it departs from our usual practice of resolving ambiguities in favor of the insured (*United States Fid. & Guar. Co. v Annunziata*, 67 NY2d 229, 232 [1986]); I might accept the majority's reading if the rest of the vendor's endorsement were consistent with it. When I read the exclusions from the vendor's endorsement, however, I cannot believe that the author of the document intended only actions arising out of product defects to be within the endorsement's coverage. If that was the author's intention, the exclusions are largely unnecessary.

The vendor's endorsement contains six exclusions, of which four are rendered pointless by the majority's interpretation. Those four provide:

"The Coverage afforded the Vendor does not apply to:

"A. 'Bodily Injury' or 'Property Damage' for which the Insured is obligated to pay 'damages' by reason of the assumption of liability in a contract or agreement;

"This exclusion does not apply to liability for 'damage' that the 'Insured' would have in absence of the contract or agreement;

"B. Any Express Warranty unauthorized by 'YOU';

. . .

"D. Any failure to make such inspections, adjustments, tests or servicing as the Vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with distribution or sale of the products;

"E. Demonstration, installation, servicing or repair operations except such operations performed by the Vendor . . . ."

If, as the majority says, the vendor's endorsement applies only in cases arising out of product defects, why did the author

bother to write exclusion A, for cases where the claim arises not out of a product defect, but solely out of a "contract or agreement"? Or exclusion B, for cases arising not out of product defects, but out of express warranties? Or exclusion D, for cases arising from certain failures by the vendor? Exclusion D is a very strange provision if all failures by the vendor are outside the endorsement's coverage to begin with. Perhaps most compelling, exclusion E, which denies coverage for "[d]emonstration, installation, servicing or repair operations *except such operations performed by the Vendor*," necessarily implies that coverage does exist for demonstrations and the like that *are* performed by the vendor.

I find the majority's attempts to give these exclusions some meaning that is consistent with its interpretation of the endorsement completely unpersuasive. It is far-fetched to think that exclusion A was intended to cover the very rare case where a manufacturer would not be liable for a product defect but for its assumption of liability in a contract; I am impressed that the majority can come up with a single example—an agreement to waive workers' compensation protection (majority op at 163)—but I cannot believe that is what the author of the endorsement had in mind. The majority simply restates exclusion B, mentioning that express warranties might be contained "in a marketing or sales brochure," but making no attempt to explain why claims based on such warranties would be excluded from an endorsement that did not cover them in the first place (*id.*). I think the majority is simply wrong in saying that exclusion D "makes sense because neglect to maintain a product properly may eventually cause it to become defective" (*id.* at 164); that is not what "product defect" means (*see* Black's Law Dictionary 450 [8th ed 2004] ["An imperfection in a product that has a manufacturing defect or design defect, or is faulty because of inadequate instructions or warnings"]). The majority is no doubt right that a product defect caused by poor maintenance, or any other imaginable piece of illogic, "might be alleged in a product-defect lawsuit" (majority op at 164), but it is highly unlikely that exclusion D was written to provide against that possibility. The majority's explanation of exclusion E is that it is designed to insure "that Raymond—rather than a nonvendor third party—created the allegedly injury-causing product defect" (*id.*). But defects are not product defects unless the manufacturer "created" them, and if the endorsement were limited to claims based on product defects, there would be no reason either to exclude

any acts by vendors or to distinguish, as exclusion E does, between third-party vendors and Arbor.

Thus, I read the vendor's endorsement here as applicable to a case, like this one, arising out of an injury caused by a Raymond product, whether the product was defective or not. Cases from other jurisdictions support this reading. *Pep Boys v Cigna Indem. Ins. Co. of N. Am.* (300 NJ Super 245, 692 A2d 546 [1997]) and *Sportmart, Inc. v Daisy Mfg. Co.* (268 Ill App 3d 974, 645 NE2d 360 [1994]) are indistinguishable from this case. Both involved vendors that negligently sold products to minors; in neither case was there any claim that there was anything wrong with the products themselves. Both cases involved policy language that, to the extent it is quoted in the decisions, was word-for-word identical to the language at issue here. In both cases, the vendor was held to be covered by the policy.

The majority relies on *Hartford* but, while Judge Posner's opinion contains general remarks about vendor's endorsements that are consistent with the result the majority reaches, *Hartford* was quite a different case. The vendor there had not only sold the product in question—a diet·pill—but had "designed the contents of the label, including the warnings" (280 F3d at 746). The injured person claimed that the warnings were inadequate (*id.*). The vendor's endorsement contained "an express exception for cases in which a claim of products liability is based on the labeling or relabeling of the product by the vendor" (*id.* at 747)—so that the result in *Hartford* seems to have been compelled by clear policy language. Nor do any of the cases cited by the *Hartford* court for what it called the "majority view" (*id.*) turn on an interpretation of language similar to that at issue here.

The majority also relies on Couch's treatise, which says that coverage under vendor's endorsements "is limited to injuries arising out of a defect in the manufacturer's product" (9 Couch on Insurance 3d § 130:3 [1997], quoted at majority op at 164). But the treatise does not offer this comment as an interpretation of any particular policy language. The treatise, I believe, must be read as describing what vendor's endorsements often say, or what its author believes they ought to say. This one does not say it.

I therefore conclude that the Appellate Division correctly held that the claim against Arbor was within the coverage provided by the vendor's endorsement, and I would affirm the Appellate Division's order.

Chief Judge KAYE and Judges G.B. SMITH and CIPARICK concur with Judge READ; Judge R.S. SMITH dissents and votes to affirm in a separate opinion in which Judges ROSENBLATT and GRAFFEO concur.

Order reversed, etc.