424 F.3d 195
 LaSALLE BANK NATIONAL ASSOCIATION, as Trustee for Certificate-holders of Asset Securitization Corporation Commercial Mortgage Pass-Through Certificates, Series 1997-D5 by and through Lend Lease Asset Management, L.P., (Successor in Interest to Ameresco Management, Inc.), formerly known as LaSalle National Bank, Plaintiff-Appellant,
v.
NOMURA ASSET CAPITAL CORPORATION and Asset Securitization Corporation, Defendants-Appellees.
Docket No. 04-5488-CV.
 United States Court of Appeals, Second Circuit.
 Argued: June 9, 2005.
 Decided: September 14, 2005.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Gregory G. Garre, Hogan & Hartson LLP, Washington, DC (Ira M. Feinberg, Hogan & Hartson LLP, New York, NY, Lorane F. Hebert, Hogan & Hartson LLP, Washington, D.C., Gary Cruciani, David Sochia, McKool Smith, PC, Dallas, TX, of counsel), for Plaintiff-Appellant.
 Daniel C. Malone, Dechert LLP, New York, N.Y. (Nory Miller, Dechert LLP, Philadelphia, PA, James E. Tolan, Dechert LLP, New York, NY, of counsel), for Defendants-Appellees.
 Before: JACOBS, SACK, and RAGGI, Circuit Judges.
 SACK, Circuit Judge.
 
 
 1
 This appeal[1] turns in large part on the meaning of several standard warranties contained in contracts for the sale and securitization of commercial mortgage loans. Plaintiff LaSalle Bank National Association ("LaSalle") brought this action in its capacity as trustee of a $1.8 billion fund of pooled mortgage loans on behalf of investors holding bonds representing interests in the fund. LaSalle alleges that defendant Nomura Asset Capital Corp. ("Nomura"), which originated or purchased from other originators each of the 156 mortgage loans in the fund, breached several warranties concerning the nature and issuance of those loans that are contained in a contract governing the sale of the mortgages to a Nomura affiliate, the Asset Securitization Corp. ("ASC"). LaSalle further alleges that ASC breached warranties contained in a second contract governing the mortgages' securitization, in which it provides assurances regarding the nature of the loans and the truth and accuracy of Nomura's representations under the contract between Nomura and ASC.
 
 
 2
 The district court (Naomi Reice Buchwald, Judge), rejecting LaSalle's claims, denied its motion for summary judgment, and granted the defendants' cross-motion for summary judgment. LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., No. 00 Civ. 8720, 2004 WL 2072501, at *1, 2004 U.S. Dist. LEXIS 18599, at *1 (S.D.N.Y. Sept. 14, 2004). Analyzing the two contracts together, the court concluded that one of the warranties contained in the first contract — the so-called "eighty percent" warranty assuring, inter alia, that the fair market value of the real property securing each loan "was at least equal to 80% of the principal amount" of the loan — had "no greater effect" than another of the warranties in that contract — the so-called "qualified mortgage" warranty assuring that each loan qualified for special tax treatment because, under Treasury Department regulations, it was "principally secured by an interest in real property." LaSalle, 2004 WL 2072501 at *6, *8. The court determined that the defendants had, in turn, satisfied the qualified mortgage warranty by virtue of a "safe harbor" provision in the applicable Treasury regulations because they "reasonabl[y] believ[ed]" that the loans were eighty percent secured by real property. Id. at *8. And the court concluded that even if the defendants were not protected by the safe harbor provision, they "cure[d]" any breach by providing the plaintiff with a legal opinion letter affirming that the qualified mortgage warranty had been satisfied. Id. at *8 n. 12. The court also rejected the plaintiff's contention that the defendants violated a separate "underwriting" or "origination" warranty providing that the loans were issued "in accordance with customary industry standards." Id. at *10.
 
 
 3
 We agree with the district court that even viewed in the light most favorable to the plaintiff, the evidence is insufficient to establish that the defendants breached the origination warranty. We disagree, however, with the court's conclusion that the eighty percent warranty and the qualified mortgage warranty were redundant. We also do not think that the safe harbor provision — the application of which was precluded by the terms of the mortgage sale contract, and which, in any event, does not apply to mortgage originators — covered, and therefore protected the defendants, or that the defendants properly cured any breach. Accordingly, we affirm the judgment of the district court with respect to the origination warranty but vacate the judgment with respect to the defendants' satisfaction of the eighty percent warranty and the qualified mortgage warranty, and remand the case for further proceedings.
 
 BACKGROUND
 
 4
 Although this dispute implicates the multi-billion dollar market for a complex and often risky class of investments known as commercial mortgage-backed securities, it revolves around a single, ill-fated mortgage on a now-defunct Chicago-area hospital. The $50 million loan, issued on August 28, 1997, to an entity called HPCH, LLC (the "Doctors Hospital Loan"), was secured, at least in part, by the hospital's aging building and surrounding land. The building and land were, in turn, leased to Doctors Hospital of Hyde Park, Inc. ("DHHP" or "Doctors Hospital"), a company controlled by Dr. James Desnick, a local ophthalmologist and businessman[2] who also controlled HPCH. The Doctors Hospital Loan was underwritten by Nomura, a major participant in the mortgage-backed securities market, which in October 1997 sold it, along with 155 other commercial mortgages, to an affiliate, ASC.[3] ASC, in turn, packaged the mortgages into a single, $1.8 billion fund, the Series 1997-D5 Trust (the "D5 Trust"), appointed LaSalle as the fund's trustee, and sold stakes in the fund to investors. It is these stakes — the "bonds" or "certificates" — that are ordinarily referred to as commercial mortgage-backed securities ("CMBS").
 
 
 5
 In April 2000, less than three years after the creation of the D5 Trust and the issuance of the related bonds, Doctors Hospital closed its doors and filed for Chapter 11 bankruptcy protection. The following month, the bankruptcy court in which the case was pending authorized the hospital to reject the unexpired portion of its lease on the hospital property, and in June 2000, HPCH defaulted on the loan. The bankruptcy and subsequent default precipitated a flurry of recriminations among the parties to the D5 transaction including, on the one side, LaSalle and the holders of the D5 bonds, and on the other, Nomura and ASC. These disputes ultimately led to the filing of the instant lawsuit.
 
 
 6
 Underlying this suit are two contracts: the Mortgage Loan Purchase and Sale Agreement ("MLPSA") between Nomura and ASC, and the Pooling and Servicing Agreement ("PSA") among ASC, LaSalle, and several other entities hired to service the mortgages in the D5 Trust. We examine the relevant provisions of each of those contracts in turn. We begin, however, with a brief review of some of the actions Nomura took before issuing the Doctors Hospital Loan and selling it to ASC for inclusion in the D5 Trust.
 
 
 The Doctors Hospital Loan
 
 
 7
 Nomura completed the Doctors Hospital Loan after obtaining a third-party appraisal of "the market value of the going-concern known as Doctor's [sic] Hospital of Hyde Park, as of August 1, 1997." See Letter from David S. Felsenthal, Managing Director, Valuation Counselors, to Geoff Smith, Analyst, Nomura Commercial Real Estate Finance 2 (Aug. 28, 1997). The appraisal employed three "valuation approaches." See Valuation Counselors, An Appraisal of Doctor's Hosp. of Hyde Park Chicago, Ill. for Nomura Commercial Real Estate Finance as of Aug. 1, 1997, at 42 (Aug. 28, 1997) ("Valuation Counselors appraisal" or "the appraisal"). Under the "cost approach," which assesses "the market value of the land, as vacant, to which the depreciated replacement cost of the improvements and equipment is added," the appraisal estimated the hospital's value at $40.6 million. Id. at 43, 57. Under the "sales comparison" approach, which represents "the cost of acquiring an equally desirable substitute property," the appraisal placed the hospital's value at $64 million. Id. at 42, 70. And under the "income capitalization approach," which "convert[s] anticipated benefits, i.e., cash flows and reversions, into property value," the appraisal determined the hospital's value to be $68 million. Id. at 42, 91. The appraisal concluded that "buyers of this property type typically do not rely upon the Cost Approach when making purchase decisions," but that the approach can nonetheless be "useful for allocation purposes." Id. at 92. At the same time, it reported that "buyers of hospitals typically base their purchase decisions on the facility's ability to generate cash flow and income," such that the income capitalization approach offered "the best indicator of value" for the Doctors Hospital property. Id. at 93. Accordingly, the appraisal concluded that the "market value" of the property, including land, improvements, equipment, and intangibles, was $68 million. Id. The appraisal allocated $3 million of this amount to the hospital's "land," approximately $28 million to building and site "improvements," and the rest to "equipment" and "intangibles." Id.
 
 
 8
 In addition to obtaining the appraisal, Nomura retained the accounting firm then known as Coopers & Lybrand L.L.P. to evaluate regulatory issues confronting the hospital as well as its cash flow prospects. The accounting firm's report, dated September 1997, purported "not [to] indicate in any way projected financial results of DHHP or the financial feasibility of the transaction upon the Borrower," but nonetheless concluded that "[i]f DHHP is able to achieve profit margins that yield results similar to the adjusted net operating income for the trailing twelve month period ending July 31, 1997, it should generate cash flows in excess of the amounts needed to meet the debt service requirements of this transaction." Coopers & Lybrand L.L.P., Nomura Asset Capital Corp. Summary of Info. for Doctor's [sic] Hosp. of Hyde Park Refinancing: $50,000,000, at 3, 6 (Sept.1997).[4]
 
 
 9
 Nomura also retained a member of the law firm of Cadwalader, Wickersham & Taft "to review the loans in the [D5] pool to determine if they and the trust satisfied" Internal Revenue Service requirements for classification as a Real Estate Mortgage Investment Conduit ("REMIC"), a designation that would exempt the Trust from federal income tax at the pool level. Defs.-Appellees' Br. at 17-18. In analyzing the Doctors Hospital Loan, the lawyer determined, based on the loan amount of $50 million and the hospital's appraised value of $68 million, that the "loan-to-value" ratio was approximately 73 percent. Dep. of Charles M. Adelman at 128-35, Steed Fin. LDC v. Nomura Sec. Int'l, No. 00 Civ. 8058, and LaSalle Bank Nat'l Ass'n v. Asset Securitization Corp., No. 00 Civ. 9720 (S.D.N.Y. June 4, 2003). In its brief on appeal, Nomura tells us that a loan-to-value ratio of 125 percent or less corresponds to a "value-to-loan" ratio of eighty percent or more — one regulatory threshold for a mortgage to be "qualified" for inclusion in a REMIC. Defs.-Appellees' Br. at 18. Having thus concluded that the Doctors Hospital Loan met this threshold, and having reached similar conclusions with respect to the other loans in the D5 Trust, the lawyer "issued a written, legal opinion — executed on the D5 closing date ... that the trust was REMIC-qualified." Id. at 19; see also Letter from Cadwalader, Wickersham & Taft to Nomura Securities Int'l Inc. 4 (Oct. 24, 1997).
 
 
 10
 
 The Mortgage Loan Purchase and Sale Agreement
 
 
 
 11
 Having agreed, after conducting this due diligence, to issue the Doctors Hospital Loan, Nomura subsequently agreed to sell the loan, packaged with 155 others, to its affiliate, ASC. In the MLPSA, Nomura provides to ASC certain warranties concerning the loans sold, and acknowledges ASC's simultaneous assignment of those loans, and of the accompanying "representations and warranties," to LaSalle, as trustee, "for the benefit of the Holders of the Certificates" of the D5 Trust. MLPSA ¶ 3(c).[5] The MLPSA provides that "[w]ithin 90 days of the receipt of the notice ... of a breach ... [Nomura] shall either (i) repurchase the related Mortgage Loan ... or (ii) promptly cure such breach in all material respects." Id. ¶ 3(b).
 
 
 12
 Three warranties contained in the MLPSA are at issue in this lawsuit. The first, the "underwriting" or "origination" warranty, provides that "[w]ith respect to each Mortgage Loan originated by [Nomura], no fraudulent acts were committed by [Nomura] during the origination process of such Mortgage Loan and the origination, servicing and collection of each Mortgage Loan is in all respects legal, proper and prudent in accordance with customary industry standards." Id. ¶ 2(b)(xix)(A).
 
 
 13
 The second, the "eighty percent" warranty, provides that each loan "is directly secured by a Mortgage on a commercial property or multifamily residential property," and that "the fair market value of such real property as evidenced by an [appraisal by a member of the Appraisal Institute ("MAI")] conducted within 12 months of the origination of the Mortgage Loan, was at least equal to 80% of the principal amount of the Mortgage Loan" either at the time the loan was originated, or at the time the sale of the mortgages closed. Id. ¶ 2(b)(xxix).
 
 
 14
 The third, the "qualified mortgage" warranty, alludes to the type of mortgage qualified for inclusion in a REMIC. The warranty provides that "[e]ach Mortgage Loan constitutes a `qualified mortgage' within the meaning of Section 860G(a)(3) of the [Internal Revenue] Code (but without regard to the rule in Treasury Regulations 1.860 G-2(f)(2) that treats a defective obligation as a qualified mortgage, or any substantially similar successor provision)." Id. ¶ (2)(b)(xxxi). Section 860(G)(a)(3) of the Code, in turn, includes within the designation "qualified mortgage" "any obligation ... which [inter alia] is principally secured by an interest in real property." 26 U.S.C. § 860G(a)(3)(A). Under Treasury Department regulations, an obligation may be "principally secured by an interest in real property" if it satisfies one of two tests. The "80-percent test" requires that "the fair market value of the interest in real property securing the obligation" equal at least eighty percent of the value of the obligation on either the date the obligation is originated or the date it is included in the REMIC. 26 C.F.R. § 1.860G-2(a)(1)(i). The "alternative" test requires that "substantially all of the proceeds of the obligation were used to acquire or to improve or protect an interest in real property that, at the origination date, is the only security for the obligation." Id. § 1.860G-2(a)(1)(ii).
 
 
 15
 The regulations also include a "safe harbor" provision pursuant to which an obligation is "deemed" to be "principally secured by an interest in real property" if the "sponsor" of the REMIC "reasonably believes" that the obligation is so secured "at the time the sponsor contributes [the] obligation to [the] REMIC." Id. § 1.860G-2(a)(3)(i). Such a "reasonable belief" may, in turn, be based either on "[r]epresentations and warranties made by the originator of the obligation," or on "[e]vidence indicating that the originator of the obligation typically made mortgage loans in accordance with an established set of parameters ... [that] would satisfy at least one of the [relevant] tests." Id. § 1.860G-2(a)(3)(ii). If, however, notwithstanding the sponsor's "reasonable belief," the obligation later proves not to be principally secured by an interest in real property, "the obligation is a defective obligation and loses its status as a qualified mortgage 90 days after the date of discovery." Id. § 1.860G-2(a)(3)(iii). The safe harbor provision goes on to refer to section 1.860G-2(f) of the regulations — the section referenced in the MLPSA warranty — which governs "defective obligations." That section provides that "[i]f a REMIC discovers that an obligation is a defective obligation" — because, for example, it is not "principally secured by an interest in real property," id. § 1.860G-2(f)(1)(iii) — "and if the defect is one that, had it been discovered before the startup day, would have prevented the obligation from being a qualified mortgage," the REMIC has ninety days to "cause[] the defect to be cured or [to] dispose[] of the defective obligation" before the loan "ceases to be a qualified mortgage," thereby jeopardizing the REMIC's tax-exemption, id. § 1.860G-2(f)(2).
 
 
 The Pooling and Servicing Agreement
 
 
 16
 Under the PSA, ASC indicates its intent to sell bonds in the D5 Trust and, in furtherance of that intent, assigns the mortgages to LaSalle as trustee of the D5 Trust on behalf of the bondholders. See PSA at 1, § 2.01. LaSalle, in turn, agrees, inter alia, to "elect" that the D5 Trust be designated a REMIC "for federal income tax purposes." See id. at 1; see also id. § 4.04(a) (noting the parties' intent that the D5 Trust "shall be conducted so as to qualify it as a `real estate mortgage investment conduit' as defined in, and in accordance with, the REMIC Provisions, and the provisions hereof shall be interpreted consistently with this intention").
 
 
 17
 The PSA contains ASC's warrant "with respect to each Mortgage Loan" that "[a]ll of the representations and warranties of [Nomura] contained in the [MLPSA] are true and correct" as of the date the PSA was executed. Id. § 2.03(b)(v). ASC further warrants that each loan "is directly secured by a Mortgage on Real Property," and that "either (i) substantially all of the proceeds ... were used to acquire or improve or protect an interest in real property that, at the origination date, was the only security for the Mortgage Loan," or "(ii) the fair market value of such real property was at least equal to 80% of the principal amount of the Mortgage Loan ... at origination ... or ... at the Closing Date." Id. § 2.03(b)(vi). The PSA also provides that "[u]pon discovery... of a breach of the representation and warranty set forth in Section 2.03(b)(vi) or that any Mortgage Loan otherwise fails to constitute a Qualified Mortgage," ASC will be promptly notified and will "correct such condition or repurchase or cause [Nomura] to repurchase such Mortgage Loan ... within 90 days of discovery of such failure." Id. § 2.03(d). The contract stipulates that "the obligations of [ASC] ... to cure or repurchase a Mortgage Loan which fails to constitute a Qualified Mortgage shall be the sole remedies available to [LaSalle] against [ASC] respecting[] a breach of a representation or warranty set forth in Section 2.03(b)(vi)." Id.
 
 
 The District Court's Decision
 
 
 18
 LaSalle argued before the district court that Nomura and ASC breached the warranties in the MLPSA and PSA inasmuch as the Valuation Counselors appraisal estimated the combined value of the "land" and "improvements" securing the Doctors Hospital Loan at only $31 million, less than the $40 million required for the $50 million loan to be eighty percent secured by real property. LaSalle, 2004 WL 2072501, at *6. In rejecting this contention, the district court did not specifically determine whether the loan was eighty percent secured. Id. at *6-*8. Instead, it found that the defendants "reasonably believed" that the mortgage was so secured based on their own review of the loan and their "good faith reliance on the advice of [their] counsel." Id. at *7.
 
 
 19
 This "reasonable belief," the court concluded, entitled the defendants to invoke the regulatory safe harbor for REMIC qualification. Id. at *7-*8. The court thus rejected the plaintiff's contention that the defendants were barred from invoking the safe harbor by the MLPSA's "carve-out" for "the rule in Treasury Regulations 1.860G-2(f)(2) that treats a defective obligation as a qualified mortgage, or any substantially similar successor provision." Id. at *7. "Rather," it said, "the fact that the MLPSA makes specific mention of Section 1.860G-2(f)(2), and could easily have done the same with respect to Section 1.860G-2(a)(3)(iii) (or any other specific regulation) but does not, confirms that the parties did not intend to limit the application of Section 1.860G-2(a)(3)(iii)." Id. As a result, the court concluded, "[g]iven that defendants did have a reasonable belief that the [Doctors Hospital Loan] satisfied the applicable REMIC tests, the Qualified Mortgage Warranty remains satisfied by virtue of the safe harbor." Id. at *8. And, the court added in a footnote, "[e]ven if the defendants were not protected by the safe harbor, plaintiff would not be able to prove a breach" because the "defendants provided plaintiff with the cure requested in connection with this warranty" — a letter from Nomura's attorney attesting to the loan's qualification for inclusion in a REMIC — and the "D5 Trust has continued to receive the tax benefits afforded REMICs." Id. at *8 n. 12.
 
 
 20
 The district court went on to reject LaSalle's claims under the eighty percent warranty on the basis that "[t]he language of the PSA and MLPSA suggests that the parties intended to give the 80% Warranty no greater effect than the 80% real property requirement that already flowed from the Qualified Mortgage Warranty." Id. at *8. This finding was, according to the court, "nearly conclusively" confirmed by "the parties' course of dealing," as well as by LaSalle's failure to introduce "any evidence why, as a matter of custom or practice in the mortgage industry, a choice of exactly 80%, independent of REMIC considerations, is the appropriate level of real property security for loans included in the D5 Trust." Id. at *8-*9. The court thus determined that the MLPSA's eighty percent warranty lacked "independent significance," and that "[t]he same analysis therefore applies to plaintiff's 80% Warranty claim as did to the Qualified Mortgage Warranty claim." Id. at *9.
 
 
 21
 The court, finally, rejected LaSalle's contention that the defendants violated the underwriting warranty by failing to ensure that the origination of the Doctors Hospital Loan was "proper and prudent in accordance with customary industry standards." Id. While the court acknowledged that the Valuation Counselors appraisal was dated August 28, 1997 — the same date the loan was issued — it found "without merit" the argument that Nomura "could not have adequately reviewed" the appraisal before closing the D5 Trust two months later. Id. The court also viewed "the reactions of the rating agencies to the D5 securitization [as] telling," noting that Standard & Poor's, for example, found the Doctors Hospital Loan to be "a very good loan," id. at *10 (internal quotation marks omitted), an "endorsement" that the court said "weighs heavily in defendants' favor," id. The court also accepted the testimony of the defendants' securitization expert — who "attested that the origination of the [Doctors Hospital Loan] met customary industry standards," id. — but noted that LaSalle "is proceeding without an expert of its own," id. at *10 n. 13. At the same time, the court found it "unnecessary" to consider the testimony of two witnesses LaSalle did offer. Id. at *10 nn.13-14.
 
 
 22
 LaSalle appeals.
 
 DISCUSSION
 
 23
 On appeal, LaSalle contends, first, that the district court erred by failing to consider the eighty percent warranty independently of the qualified mortgage warranty. Second, LaSalle argues that the court erred in finding Nomura to be covered under the regulatory safe harbor for qualified mortgages, and in finding, alternatively, that the defendants cured any breach by providing a letter opining that the mortgage qualified for inclusion in a REMIC. Third, LaSalle asserts that the district court erred in failing separately to consider ASC's warranties in the PSA, which it contends were independent of the warranties in the MLPSA. Finally, LaSalle argues that the court erred in failing to consider its expert testimony with regard to the origination warranty, and in finding against it on that claim. We begin by addressing the warranties contained in the MLPSA and then turn to the warranties in the PSA.[6]
 
 I. Standard of Review
 
 24
 "We review a district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the nonmoving party," Mack v. Otis Elevator Co., 326 F.3d 116, 119 (2d Cir.), cert. denied, 540 U.S. 1016, 124 S.Ct. 562, 157 L.Ed.2d 428 (2003), and "drawing all inferences and resolving all ambiguities in favor of the nonmoving party," Preseault v. City of Burlington, 412 F.3d 96, 101 (2d Cir.2005). "In New York,[7] [] if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir.2005) (citation and internal quotation marks omitted). "However, when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." Id. (citation and internal quotation marks omitted).
 
 
 25
 The evidence considered on summary judgment must generally be admissible evidence. See, e.g., Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 271 (2d Cir.2002); Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir.1999). Even on summary judgment, a district court "has wide discretion in determining which evidence is admissible, [and] we review its evidentiary rulings for manifest error." Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736, 746 (2d Cir.1998); see also Raskin v. Wyatt Co., 125 F.3d 55, 65-66 (2d Cir.1997) ("The principles governing admissibility of evidence do not change on a motion for summary judgment.").
 
 II. The Eighty Percent Warranty
 
 26
 In interpreting a contract under New York law, "words and phrases... should be given their plain meaning," and the contract "should be construed so as to give full meaning and effect to all of its provisions." Shaw Group, Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir.2003) (citation and internal quotation marks omitted). "[A]n interpretation of a contract that has `the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'" Id. at 124 (quoting Galli v. Metz, 973 F.2d 145, 149 (2d Cir.1992) (internal quotation marks omitted)).
 
 
 27
 While the language of the eighty percent warranty is similar to that of the qualified mortgage warranty, it is apparent to us that these two provisions of the MLPSA serve different purposes and have different effects. The essence of the latter — the qualified mortgage warranty — is that an "obligation" is capable of being included in a REMIC, where it qualifies for special treatment for federal income tax purposes. An obligation may be so "qualified" if it is "principally secured by an interest in real property" without a guarantee as to the "fair market value" of that property as a percentage of the value of the loan. Although the final value of the improved property under the alternative test may well exceed 80 percent of the value of the loan, lenders might plausibly prefer the 80 percent guarantee as providing them with present certainty (since they do not have to concern themselves with the wisdom of the borrower's future investments in the property interest). Warranting a mortgage as "qualified" may give comfort as to the collateral underlying it, but such a warranty chiefly affords assurance as to a loan's tax status, not the extent to which it is secured by that collateral.
 
 
 28
 The eighty percent warranty, by contrast, provides precisely the sort of information that the qualified mortgage warranty does not. It constitutes an assurance that each loan in the D5 Trust was, as of the date of the loan's origination or the date the D5 Trust closed, at least eighty percent secured by real property, "as evidenced by an MAI appraisal conducted within 12 months" of the loan's origination. The qualified mortgage warranty does not require an appraisal — and specifically not an MAI appraisal, which is performed by a certified member of the Appraisal Institute.[8] The eighty percent warranty thus provides investors in the D5 Trust with a greater degree of certainty about the quality of the Trust's security.[9] It does not, however, ensure that those loans are "qualified" for tax purposes. It is entirely possible, for example, that a loan would be eighty percent secured by real property, and thus "principally secured by real property," but would not qualify for inclusion in a REMIC for some other reason specified in the statute, such as that it was not "transferred to the REMIC on the startup day in exchange for regular or residual interests in the REMIC." See 26 U.S.C. § 860G(a)(3)(A)(i).
 
 
 29
 We think, based on this reading of the warranty provisions, that the MLPSA means what it says: that each loan in the D5 Trust is secured by a mortgage on commercial or multifamily property the fair market value of which "was at least equal to 80% of the principal amount of the Mortgage Loan" either on the date the mortgage was originated, or on the date the D5 Trust closed, and that each mortgage "constitutes a `qualified mortgage' within the meaning of ... the [Internal Revenue] Code." This straightforward reading is in keeping with the "plain meaning" of the contract's terms, and accords each warranty independent weight, thereby giving full "effect to all of its provisions." We therefore disagree with the district court's construction, which renders the eighty percent warranty superfluous.
 
 
 30
 Because we do not think the MLPSA is reasonably capable of "more than one meaning," see Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co., 375 F.3d 168, 178 (2d Cir.2004) (quoting World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d Cir.2003) (internal quotation marks omitted)), we conclude that the district court ought not to have required that LaSalle produce evidence that eighty percent warranties are the "custom or practice in the mortgage industry," LaSalle, 2004 WL 2072501, at *9, and that the court should not have relied on other extrinsic evidence of the parties' intent, such as their "course of dealing."[10] See, e.g., Postlewaite, 411 F.3d at 67 ("[I]f `a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence.'") (quoting Ruttenberg v. Davidge Data Sys. Corp., 215 A.D.2d 191, 192-93, 626 N.Y.S.2d 174, 175 (1st Dep't 1995)).[11]
 
 
 31
 This conclusion leaves open the question whether the fair market value of the "real property" securing the Doctors Hospital Loan, as evidenced by the required MAI appraisal, was at least $40 million — eighty percent of the value of the $50 million loan.[12] The district court did not attempt to resolve this issue, and it is not clear to us that it could have done so on summary judgment inasmuch as the evidence submitted by both sides is at odds on the question of which of the appraisal's values for various components of the Doctors Hospital property corresponds to the fair market value of the "real property" that is relevant for purposes of the eighty percent warranty. That question seems to us likely to be a "genuine issue of material fact" that is appropriately reserved for trial upon remand.
 
 III. The Qualified Mortgage Warranty
 
 32
 We also disagree with the district court's conclusion that the defendants satisfied the qualified mortgage warranty by virtue of the regulatory safe harbor, and that, in the alternative, they cured any breach by providing LaSalle with a legal opinion letter reconfirming that the Doctors Hospital Loan was "qualified." LaSalle, 2004 WL 2072501, at *8 n. 12.
 
 
 33
 The safe harbor provision depends, by its terms, on the beliefs of REMIC "sponsors," and not of the "originators" of mortgages that are ultimately included in REMICs. See 26 C.F.R. § 1.860G-2(a)(3)(i) ("If, at the time the sponsor contributes an obligation to a REMIC, the sponsor reasonably believes that the obligation is principally secured by an interest in real property ... then the obligation is deemed to be so secured." (emphasis added)). Indeed, the regulation explains that
 
 
 34
 a sponsor may base a reasonable belief concerning any obligation on—
 
 
 35
 (A) Representations and warranties made by the originator of the obligation; or
 
 
 36
 (B) Evidence indicating that the originator of the obligation typically made mortgage loans in accordance with an established set of parameters, and that any mortgage loan originated in accordance with those parameters would satisfy at least one of the tests [for an obligation principally secured by an interest in real property].
 
 
 37
 Id. § 1.860G-2(a)(3)(ii) (emphasis added). There is no dispute in this case that Nomura was the originator of the Doctors Hospital Loan and that ASC, having purchased the loan from Nomura and contributed it to the D5 Trust, was the sponsor of the REMIC. Accordingly, in evaluating the applicability of the safe harbor provision, we consider the perspective of ASC, not Nomura.[13]
 
 
 38
 In assessing the availability of the safe harbor, we note that the regulation also provides that "[a] sponsor cannot avail itself of this safe harbor with respect to an obligation if the sponsor actually knows or has reason to know that the obligation fails both of the tests" for whether a loan is principally secured by an interest in real property. Id. § 1.860G-2(a)(3)(i). Here, the sponsor of the D5 Trust, ASC, is an affiliate of the originator of the Doctors Hospital Loan, Nomura. See Defs.-Appellees' Br. at i. Although the issue was not raised on appeal and its resolution is neither possible based on the facts in the current record nor necessary to decide the issues before us for the reasons that follow, ASC's affiliation with Nomura at least would raise a factual question concerning whether it had "reason to know" whether the mortgages in the D5 Trust were "principally secured" by interests in real property, which would prevent it from invoking the protections of the safe harbor. Cf. Ford Motor Credit Co. v. Weaver, 680 F.2d 451, 458 (6th Cir.1982) (relationship between two subsidiaries of Ford Motor Co. "is essentially one of two siblings" and "standing alone, does not support the imputation of notice or knowledge" from one subsidiary to the other (emphasis added)). For similar reasons, we think it is at least arguable that Nomura should not, in any event, be permitted to "avail itself" of the safe harbor, which seems primarily intended to protect REMIC sponsors and investors, not mortgage originators. It would seem to be anomalous for a mortgage originator — who invariably "knows or has reason to know" whether an obligation it underwrote is "principally secured by an interest in real property" — to be afforded "safe harbor" from its own misrepresentations, deliberate or not, when a REMIC sponsor is explicitly barred from invoking the safe harbor in such circumstances.
 
 
 39
 We need not address this issue because we think that the safe harbor is inapplicable and therefore does not protect the defendants for another reason. As we have noted, the MLPSA provides that the qualified mortgage warranty applies "without regard to the rule in Treasury Regulations 1.860G-2(f)(2) that treats a defective obligation as a qualified mortgage, or any substantially similar successor provision." MLPSA ¶(2)(b)(xxxi). Section 1.860G-2(f)(2), in turn, specifies that if a REMIC belatedly discovers that a mortgage is "defective" — because, for example, the loan turns out not to have been principally secured by an interest in real property — the mortgage will "cease[] to be a qualified mortgage" ninety days after the defect is discovered, "unless the REMIC either causes the defect to be cured or disposes of the defective obligation." 26 C.F.R. § 1.860G-2(f)(2). Similarly, the safe harbor provision, located within the same section of the regulations, provides that notwithstanding a sponsor's "reasonable belief" that a mortgage is "qualified," if the REMIC belatedly "discovers that the obligation is not principally secured by an interest in real property, the obligation is a defective obligation and loses its status as a qualified mortgage 90 days after the date of discovery." Id. § 1.860G-2(a)(3)(iii). The safe harbor provision then points to "paragraph (f) of this section, relating to defective obligations" — the paragraph referenced in the MLPSA. Id.
 
 
 40
 Because the two provisions are interrelated, we find it difficult to conclude, as did the district court, that the MLPSA's "carve-out" for section 1.860G-2(f)(2) does not also preclude the defendants' reliance on the safe harbor. The safe harbor is, by its terms, operative only in conjunction with the provision for defective obligations. Since the "carve out" requires the treatment of defective obligations as qualified mortgages to be disregarded — they are immediately "not qualified" — the safe harbor is rendered irrelevant.
 
 
 41
 We also disagree with the district court's alternative conclusion that the defendants cured any breach by providing LaSalle with a legal opinion letter attesting to the qualified nature of the mortgage even if the mortgage turns out not to have been so qualified. As the court noted, LaSalle, acting through the attorneys for the company servicing the Doctors Hospital Loan, "asked [the] defendants to provide factual support for [their] representation ... that the [Doctors Hospital Loan] was REMIC-qualified, stating that it would accept such support `in the form of a legal opinion.'" LaSalle, 2004 WL 2072501, at *8 n. 12. The same letter "expressly reserve[d] all rights and remedies ... available at law or in equity." See Letter from Robin R. Green, Esq., Akin, Gump, Strauss, Hauer & Feld, L.L.P., to David Finlay, ASC 3 (June 26, 2000). And even had the letter not done so, a request for "factual support" is plainly not a suggestion that a lawyer's opinion letter will be accepted as a "cure." Indeed, such a construction is at odds with the MLPSA, which provides — in a paragraph entitled "Notice of Breach; Cure and Repurchase" — that within ninety days of receiving notice of a breach, the defendants "shall either (i) repurchase the related Mortgage Loan at the Repurchase Price or (ii) promptly cure such breach in all material respects." MLPSA ¶ 3(b). Of course, the defendants did not repurchase the Doctors Hospital Loan. And if the Internal Revenue Service ultimately determines that the Doctors Hospital Loan is not "qualified," then the opinion letter cited by the district court did not render it qualified and therefore did not cure the breach.[14]
 
 
 42
 For the foregoing reasons, we conclude that the district court erred in finding that Nomura and ASC satisfied the qualified mortgage warranty either by virtue of the regulatory safe harbor or because they cured any breach. We do not, however, have a sufficient basis for concluding that the warranty was in fact breached. While the parties do not dispute that the proceeds of the Doctors Hospital Loan were not used "to acquire or to improve or protect an interest in" the hospital's "real property," 26 C.F.R. § 1.860G-2(a)(1)(ii), it is unclear, for reasons we have previously elaborated, whether, at the time the loan was issued or included in the D5 Trust, it was secured by "real property" the "fair market value" of which was equal to at least eighty percent of the loan's value, id. § 1.860G-2(a)(1)(i). If so, and if that fact was evidenced by the required MAI appraisal, of course, there was no such breach. Accordingly, we cannot determine at this stage of the proceedings whether the loan satisfied the test for being "principally secured by an interest in real property," and was therefore "qualified." As with the eighty percent warranty, we think the question likely raises a "genuine issue of material fact" that is appropriately reserved for trial.
 
 IV. The Origination Warranty
 
 43
 In considering LaSalle's claim that Nomura's issuance of the Doctors Hospital Loan was not "proper and prudent in accordance with customary industry standards," the district court found "without merit" the argument that Nomura "could not have adequately reviewed" the Valuation Counselors appraisal before closing the loan, even though the final version of the appraisal was delivered to Nomura on the same date that the loan closed, because Nomura received the appraisal two months before the D5 Trust closed. LaSalle, 2004 WL 2072501, at *9. The court also noted that LaSalle was "proceeding without an expert of its own," id. at *10 n. 13, even as it declined to consider the testimony of two of LaSalle's proffered witnesses on the basis that doing so "was unnecessary" to the resolution of the case, id. at *10 n. 14.
 
 We have previously observed that
 
 44
 an appeal of a summary judgment presenting evidentiary issues raises two levels of inquiry. At the first level, we review the trial court's evidentiary rulings, which define the summary judgment record, and we give these rulings their due deference. At the second level, with the record defined, we review the trial court's summary judgment decision de novo. When the contested evidence is essential to the cause of action and the trial court has excluded the evidence, we may decide the appeal at the first level solely on the basis of the soundness of the evidentiary ruling. For if we uphold the exclusion of essential evidence, the second-level inquiry becomes academic.
 
 
 45
 Raskin, 125 F.3d at 67 (quoting Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1109 (5th Cir.1991) (en banc) (per curiam)). Here, while it would have been preferable, given the district court's finding that LaSalle was "proceeding without an expert," for the court to have explained its failure to consider the testimony of the witnesses LaSalle did produce, we note that one explanation is readily apparent: The LaSalle witness who testified about underwriting standards, while an experienced commercial lending executive, was not designated an expert on the CMBS industry. The district court could well have concluded that the witness's testimony was therefore irrelevant to the determination of underwriting standards in the CMBS industry. See United States v. United States Gypsum Co., 340 U.S. 76, 85, 71 S.Ct. 160, 95 L.Ed. 89 (1950) (on plaintiff's motion for summary judgment, defendants "had the right to lay facts before the court that were pertinent to the court's decision," but "[s]uch rights . . . did not require the trial court to admit evidence that would not affect the outcome of the proceedings"). Although it is not clear to us, based on the evidence presented, that the relevant standards between the traditional lending and CMBS industries are altogether different — and we might, as a result, have been more willing to consider the LaSalle witness's testimony were we in the district court's position — we cannot say that its contrary conclusion with respect to that evidence represented an abuse of discretion.
 
 
 46
 Moreover, although the fact that the Valuation Counselors appraisal was delivered on the date the Doctors Hospital Loan closed raises questions about Nomura's haste in completing the transaction, we cannot conclude, based on that fact alone, that Nomura did not conduct its due diligence in conformance with "customary industry standards." Indeed, even if the loan turns out to have been only sixty percent secured — as LaSalle contends — rather than eighty percent secured — as the defendants submit — LaSalle presents no basis for us to determine that such under-collateralization by itself constitutes improper or imprudent practice in the CMBS industry.
 
 
 47
 Accordingly, because we conclude that the district court acted within its discretion in declining to consider LaSalle's evidence of customary lending practices in the CMBS industry, we must also conclude that there was no triable issue of material fact as to LaSalle's claim that Nomura's origination of the Doctors Hospital Loan violated those standards. Having upheld the exclusion of evidence essential to LaSalle's claim, a "second-level inquiry" into the merits of that claim is unnecessary.
 
 
 48
 Because, taking the evidence reasonably deemed by the district court to be admissible in the light most favorable to the plaintiff and deciding all inferences and resolving all ambiguities in its favor, we agree with the district court that there is no triable issue of fact as to the alleged breach of this warranty, we affirm the district court's judgment in this regard.
 
 V. The PSA Warranties
 
 49
 The PSA contains two warranties. The first provides that "[a]ll of the representations and warranties of [Nomura] contained in the Mortgage Loan Purchase and Sale Agreement are true and correct as of [October 24, 1997]", the date the PSA was executed. PSA § 2.03(b)(v). This provision, we conclude, constitutes ASC's assumption of the warranties contained in the MLPSA, which are therefore independently binding on it. Because we have already examined those warranties, we need not revisit them here.
 
 
 50
 The second PSA warranty provides that each loan in the D5 Trust was "directly secured by a Mortgage on Real Property" and that
 
 
 51
 either (i) substantially all of the proceeds of such Mortgage Loan were used to acquire or improve or protect an interest in real property that, at the origination date, was the only security for the Mortgage Loan . . . or (ii) the fair market value of such real property was at least equal to 80% of the principal amount of the Mortgage Loan (a) at origination . . . or (b) at the Closing Date.
 
 
 52
 Id. § 2.03(b)(vi). This text tracks, almost verbatim, the test for a property "principally secured by an interest in real property." The question thus arises whether this PSA provision constitutes an independent warranty by ASC that simply resembles the "qualified mortgage" warranty in the MLPSA, or whether it is identical to that warranty and merely redundant, in which case the regulatory safe harbor would, at least in theory, apply, because the PSA provision, unlike its MLPSA counterpart, contains no carve-out.
 
 
 53
 Because we have already determined that the safe harbor does not protect defendants with respect to the qualified mortgage warranty in the MLPSA, however, this question is academic. Should the district court determine on remand that the fair market value of the real property securing the Doctors Hospital Loan was, at the relevant time, not equal to eighty percent of the value of that loan, then ASC will have breached warranties in both the MLPSA and the PSA. Correspondingly, if the court finds that the loan was, in fact, eighty percent secured, then ASC will have satisfied the warranties in both contracts. If either both contracts have been breached or both have not been — the only two possibilities, we think — we do not see what it would add to the analysis to determine whether these particular warranties are independent or not.
 
 CONCLUSION
 
 54
 For the foregoing reasons, we affirm the district court's grant of summary judgment dismissing LaSalle's claim that the defendants breached the origination warranty in the MLPSA, but vacate its judgment with respect to LaSalle's remaining claims and remand the case for further proceedings in light of this opinion.
 
 
 
 Notes:
 
 
 [1]
 This appeal was heard in tandem withSteed Finance LDC v. Nomura Sec. Int'l, Inc., No. 04-5485, 2005 WL 2243899, which we decide today by summary order.
 
 
 [2]
 Dr. Desnick had apparently theretofore obtained some measure of notoriety. It resulted, at least in part, from the June 10, 1993, broadcast of an ABC NewsPrimeTime Live segment, see Desnick v. Am. Broad. Cos., 44 F.3d 1345, 1348 (7th Cir.1995) ("[Reporter Sam] Donaldson introduce[d] the segment by saying, `We begin tonight with the story of a so-called "big cutter," Dr. James Desnick.... [I]n our undercover investigation of the big cutter you'll meet tonight, we turned up evidence that he may also be a big charger, doing unnecessary cataract surgery for the money.'" (ellipsis and alteration in original)), and Desnick's subsequent "suit ... for trespass, defamation, and other torts arising out of the production and broadcast of [the] segment," id. at 1347. The lawsuit was ultimately unsuccessful. See Desnick v. Am. Broad. Cos., 233 F.3d 514 (7th Cir.2000).
 
 
 [3]
 Both companies are wholly owned subsidiaries of Nomura Holdings Inc., a publicly held corporation organized under the laws of JapanSee Defs.-Appellees' Br. at i.
 
 
 [4]
 The Coopers & Lybrand report appears not to have entailed a detailed assessment of the regulatory risks facing Doctors Hospital specifically, although it did note that hospitals generally were at risk of being targeted under "Operation Restore Trust," a federal initiative aimed at curtailing Medicare and Medicaid fraud. Coopers & Lybrand L.L.P., Nomura Asset Capital Corp. Summary of Info. for Doctor's Hosp. of Hyde Park Refinancing: $50,000,000, at 11-12 (Sept.1997)
 
 
 [5]
 A separate provision of the MLPSA reaffirmed that
 [t]he representations, warranties and agreements made by [Nomura] in this Agreement are made for the benefit of, and may be enforced by or on behalf of, the Trustee and the Holders of Certificates to the same extent that [ASC] has rights against [Nomura] under this Agreement in respect of representations, warranties and agreements made by [Nomura] herein and such representations and warranties shall survive ... until the termination of the Pooling and Servicing Agreement.
 MLPSA ¶ 8.
 
 
 [6]
 In so doing, we consider not only Nomura's warranties under the MLPSA, but also ASC's obligations pursuant to those warranties under that contract, because, as noted in our discussion of the PSA in Part V of this opinion,infra, ASC independently warrants in the PSA that "[a]ll of the representations and warranties of [Nomura] contained in the [MLPSA] are true and correct." PSA § 2.03(b)(v).
 
 
 [7]
 Both the MLPSA and the PSA provide, and the parties do not contest, that the contracts are governed by New York lawSee MLPSA ¶ 9; PSA § 10.03; see also Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir.1996) (noting that "New York law gives full effect to parties' choice-of-law provisions").
 
 
 [8]
 The "MAI" designation indicates that an appraiser has,inter alia, "an undergraduate degree from a four-year accredited educational institution," at least "6,000 hours of experience, including 3,000 hours of specialized appraisal experience," and has passed both "a four-module, two-day comprehensive examination," as well as eleven other exams "that reflect 380 hours of classroom instruction and that test the appraiser's knowledge of basic and advanced appraisal principles, procedures and applications; report writing; valuation analysis and standards of professional practice." Appraisal Inst., About Our Designations, at http:// www.appraisalinstitute.org/about/designations.asp (last visited July 26, 2005).
 
 
 [9]
 We cannot accept the defendants' contention that the eighty percent warranty is "unsuited as [a] representation[] that the loans are adequately secured" because "[i]nvestors looking for adequate security want at least 100% of their investment secured by collateral." Defs.-Appellees' Br. at 43. While it is true that some lenders require that a loan be secured by collateral representing 100 percent or more of the loan amount, it is equally true that lenders frequently make loans secured by far less collateral. In any event, the question whether a loan is "adequately" secured is a question for the lender or purchaser of the loan, not for a court seeking to determine the meaning of a provision ostensibly warranting a specified level of security. Finally, we note that the New York Court of Appeals has recently suggested that a court may give meaning to the "economic sense" of an agreement,Raymond Corp. v. Nat'l Union Fire Ins. Co., 5 N.Y.3d 157, 165, 800 N.Y.S.2d 89, 93, 833 N.E.2d 232, 236 (NY 2005), but we understand any such consideration to be inapplicable under New York law where, as here, the language of the agreement in question is unambiguous.
 
 
 [10]
 We note parenthetically that it is not clear to us that the extrinsic evidence on which the court relied — including "letters exchanged between the parties in Spring 2000,"LaSalle, 2004 WL 2072501, at *8 — was in any event relevant to the determination of the parties' intent at the time they entered into the MLPSA, nearly three years earlier. See Murray Walter, Inc. v. Sarkisian Bros., Inc., 183 A.D.2d 140, 146, 589 N.Y.S.2d 613, 616 (3d Dep't 1992) (concluding letter "sent well after contract formation ... was not admissible extrinsic evidence of the parties' mutual intent in entering into their agreement, but merely a unilateral expression of one party's postcontractual subjective understanding of the terms of the agreement and, therefore, was not probative as an aid to the interpretation of the contract"); see also Ingersoll Milling Mach. Co. v. M/V Bodena, 619 F.Supp. 493, 506 (S.D.N.Y.1985) (finding that one party's subjective interpretation of contract, which was not communicated to other party until litigation commenced, "cannot be used to establish that [parties] had such intent and understanding when they entered into the ... contract").
 
 
 [11]
 Indeed, even if the contract were ambiguous, we think it may well have been inappropriate for the court to determine the parties' intentions on summary judgmentSee Postlewaite, 411 F.3d at 67 ("`[W]hen the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment.'" (quoting Ruttenberg, 215 A.D.2d at 193, 626 N.Y.S.2d at 175)).
 
 
 [12]
 While the August 28, 1997, appraisal gave an estimate of the hospital's total value as $68 million, the parties disagree on how much of this total should be considered in determining whether the loan satisfied the 80 percent test
 
 
 [13]
 Because it thus does not matter whether Nomura "reasonably believed" that the loan was principally secured by an interest in real property, we need not and therefore do not decide whether the district court properly concluded that Nomura's belief was reasonable based on the company's good faith reliance on the advice of its counsel
 
 
 [14]
 We reject the defendants' contention that the IRS's continued classification of the D5 Trust as a REMIC is somehow dispositive in this regard. There is no evidence in the record that the IRS has audited the Trust, and thus no indication that it would have any reason to question the Trust's status